**Electronically Filed
Intermediate Court of Appeals
CAAP-16-0000647
07-NOV-2017
09:18 AM**

NO. CAAP-16-0000647

IN THE INTERMEDIATE COURT OF APPEALS

OF THE STATE OF HAWAIʻI


STATE OF HAWAIʻI,
Plaintiff-Appellee,
v.
BRONSON KANEAIAKALA,
Defendant-Appellant


APPEAL FROM THE CIRCUIT COURT OF THE FIRST CIRCUIT
(CRIMINAL NO. 15-1-0108)


SUMMARY DISPOSITION ORDER
(By: Nakamura, Chief Judge, Leonard and Chan, JJ.)

Defendant-Appellant Bronson Kaneaiakala (Kaneaiakala) appeals from the "Judgment of Conviction and Sentence" entered on September 20, 2016 in the Circuit Court of the First Circuit (circuit court).[1] The State of Hawaiʻi (State) charged Kaneaiakala with one count of Burglary in the First Degree in violation of Section 708-810(1)(c) of the Hawaii Revised Statutes (HRS).[2] After a jury trial, Kaneaiakala was found guilty as

---

[1] The Honorable Shirley M. Kawamura presided.

[2] HRS § 708-810 (2014) provides in relevant part:

§ 708-810 **Burglary in the first degree.** (1) A person commits the offense of burglary in the first degree if the person intentionally enters or remains unlawfully in a building, with intent to commit therein a crime against a person or against property rights, and:

. . . .

charged. The circuit court sentenced Kaneaiakala to a term of imprisonment of ten years.

On appeal, Kaneaiakala contends (1) the circuit court erred in denying Kaneaiakala's "Motion to Suppress Identification of the Defendant" (Motion to Suppress); (2) there was insufficient evidence to support the conviction of Burglary in the First Degree where the evidence failed to establish the requisite identity of the alleged perpetrator; and (3) the prosecutor engaged in prosecutorial misconduct in her rebuttal argument when she expressed her own personal opinion, which is prohibited under State v. Marsh, 68 Haw. 659, 728 P.2d 1301 (1986).

Upon careful review of the record and the briefs submitted by the parties and having given due consideration to the arguments advanced and the issues raised by the parties, as well as the relevant statutory and case law, we resolve Kaneaiakala's points of error as follows, and affirm.

(1) In his first point of error, Kaneaiakala contends that the circuit court erred in denying his Motion to Suppress because the field show-up identification of Kaneaiakala by Mari Laraway (Laraway) was impermissibly suggestive and unreliable. Therefore, Kaneaiakala argues that Laraway's identification should have been suppressed.

> When the defendant challenges admissibility of eyewitness identification on the grounds of impermissibly suggestive pre-trial identification procedure, he or she has the burden of proof, and the court, trial or appellate, is faced with two questions: (1) whether the procedure was impermissibly or unnecessarily suggestive; and (2) if so, whether, upon viewing the totality of the circumstances, such as opportunity to view at the time of the crime, the degree of attention, and the elapsed time, the witness's identification is deemed sufficiently reliable so that it is worthy of presentation to and consideration by the jury.

State v. Araki, 82 Hawai'i 474, 484, 923 P.2d 891, 901 (1996) (quoting State v. Okumura, 78 Hawai'i 383, 391, 894 P.2d 80, 88 (1995)). "As long as there is not a substantial likelihood of

---

(c) The person recklessly disregards a risk that the building is the dwelling of another, and the building is such a dwelling.

2

misidentification, it is the function of the jury to determine the ultimate weight to be given the identification." State v. DeCenso, 5 Haw. App. 127, 132, 681 P.2d 573, 578 (1984) (internal quotation marks and citations omitted).

In this case, the State stipulated that the field show-up was impermissibly suggestive. Therefore, we consider only Kaneaiakala's arguments that Laraway's identification was not sufficiently reliable to be presented to and considered by the jury. See In re Doe, 107 Hawai'i 439, 450-52, 114 P.3d 945, 956-58 (App. 2005) (concluding that although the show-up procedure at issue was impermissibly suggestive, the totality of the circumstances indicated that the witness's identification was sufficiently reliable to be presented to the jury); see also DeCenso, 5 Haw. App. at 131, 681 P.2d at 577-78.

In determining whether Laraway's identification was sufficiently reliable, we first consider Laraway's opportunity to view the suspect at the time of the crime. Kaneaiakala argues that Laraway's view of the suspect was merely "fleeting." We disagree. At the Motion to Suppress hearing, Laraway testified that when she first saw the suspect near the subject apartment unit, Laraway was not far from the suspect--approximately four meters away, and it was a clear, sunny day. Laraway was able to see about half of the suspect's face from the side, and noticed that his hair was short, but curly, and he had a scruffy face. She was also able to note that the suspect was wearing a white or light blue shirt and a brimmed hat. Although the suspect was behind a hedge, Laraway was able to view the suspect prior to passing the hedge, and could still see over the hedge when walking alongside the hedge, as the hedge was "mid-rib" height.

With respect to Laraway's degree of attention when she viewed the suspect, Laraway testified that when she first saw the suspect, she knew right away that she did not recognize him, thought his behavior was unusual, and felt scared. She was attentive enough to notice that the screen of the window the suspect was crouched in front of was detached and rolled up, and that there was a bicycle next to him. Laraway also kept her

3

focus on the suspect while she was walking, and although she did not turn to face him, she continued to monitor him with her peripheral vision. Laraway was fixated enough on the suspect that she made a point to look at him again even after getting into her car.

In considering the time elapsed between the crime and the identification, we note that "[t]here is no bright line indicating what length of time would render the identification suspect." Doe, 107 Hawai'i at 451, 114 P.3d at 957. The time elapsed here was approximately two and a half hours, as Laraway first viewed the suspect at approximately 12:30 p.m., and the show-up identification occurred at approximately 3:00 p.m. We conclude that two and a half hours is not particularly significant. See, e.g., State v. Araki, 82 Hawai'i 474, 485-86, 923 P.2d 891, 902-03 (1996) (concluding that a seven-week period of time between the commission of the crime and the time of identification was "neither so short as to favor reliability nor too long to raise any serious doubts" (citations omitted)); State v. Okumura, 78 Hawai'i 383, 393, 894 P.2d 80, 90 (1995) (same conclusion as Araki for an eight-week period) (abrogated on other grounds by State v. Cabagbag, 127 Hawai'i 302, 277 P.3d 1027 (2012)); Doe, 107 Hawai'i at 451, 114 P.3d at 957 (concluding that a period as brief as two hours does not appear to be particularly significant).

Kaneaiakala further argues that Laraway's identification was unreliable because her description of the suspect to the 911 dispatcher was unspecific and inaccurate. With regard to specificity, Laraway testified that the 911 dispatcher asked only for a general description of the suspect. Laraway told the dispatcher that the suspect was a skinny black male wearing a white or light blue shirt and a brimmed hat. The dispatcher did not ask any follow-up questions regarding the suspect's appearance. With regard to accuracy, we note that Laraway initially told the dispatcher that the suspect was black, but at trial explained that she meant that the suspect had dark skin which when combined with his curly hair gave her an overall

image of a black man.[3]  In her written statement, Laraway described the suspect as Caucasian, and she explained at the Motion to Suppress hearing that "although he's not black . . . he seemed to be suntanned, Caucasian with light brown . . . skin."

We also consider the level of certainty demonstrated by Laraway during the field show-up.  As noted by the circuit court, Laraway testified that she was "pretty sure" that Kaneaiakala was the same person she had seen entering the subject apartment based upon "his skin and his hair and also his body."  Although Laraway had told a detective that she had bad eyesight and had not been wearing her glasses during her show-up identification, she testified that her concern about this was "little," and despite the fact that she was not wearing her glasses, she was sure that Kaneaiakala was the person she had seen earlier.

Based on our consideration of the totality of the circumstances, we conclude that Laraway's identification of Kaneaiakala was sufficiently reliable and worthy of presentation to and consideration by the jury.

(2)  Next, Kaneaiakala argues that there was insufficient evidence at trial to convict him where the evidence failed to establish the identity of the perpetrator beyond a reasonable doubt.  We disagree.

The jury was given the following instruction regarding eyewitness identification:

> The burden of proof is on the prosecution with reference to every element of a crime charged, and this burden includes the burden of proving beyond a reasonable doubt the identity of the defendant as the person responsible for the crime charged.
>
> You must decide whether an eyewitness gave accurate testimony regarding identification.
>
> In evaluating identification testimony, you may consider the following factors:

---

[3]  Laraway was born and raised in Japan and had lived in the United States for about ten years.  Japanese, and not English, is Laraway's first language, and she was assisted by a Japanese language interpreter when testifying at court proceedings in this case.  Laraway communicated with the dispatcher in English during the 911 call and the form she filled out to describe the suspect was written in English.

The opportunity of the witness to observe the person involved in the alleged criminal act;

The stress, if any, to which the witness was subject at the time of the observation;

The witness's ability, following the observation, to provide a description of the person;

The extent to which the defendant fits or does not fit the description of the person previously given by the witness;

The cross-racial or ethnic nature of the identification;

The witness's capacity to make an identification;

Evidence relating to the witness's ability to identify other participants in the alleged criminal act;

Whether the witness was able to identify the person in a photographic or physical lineup;

The period of time between the alleged criminal act and the witness's identification;

Whether the witness had prior contacts with the person;

The extent to which the witness is either certain or uncertain of the identification and whether the witness's assertions concerning certainty or uncertainty are well-founded;

Whether the witness's identification is in fact the product of his/her own recollection; and

Any other evidence relating to the witness's ability to make an identification.

In considering the evidence in the strongest light for the prosecution, State v. Matavale, 115 Hawai'i 149, 157-58, 166 P.3d 322, 330-31 (2007), we conclude that the State proved beyond a reasonable doubt the identity of Kaneaiakala as the person who burglarized the subject apartment unit.

The evidence adduced at trial showed that when Laraway first saw the suspect, it was the middle of a sunny day. She was only a few meters away from the suspect, and was able to observe the side of his face for three to five seconds. She was focused enough to notice the suspect's attire, a bicycle laying in the grass near the suspect, a cut in the window screen, and jalousies missing from the window laying on the ground nearby. Laraway had

lived in her apartment unit for the past ten years, did not recognize the suspect as someone who lived in her building, and thought his behavior was strange. After getting into her car, Laraway had a "perfect angle" to see the suspect, and saw that the top half of his body was inside the apartment window.

During the 911 phone call, Laraway told the dispatcher that the suspect was a skinny male of black ethnicity, and was wearing a hat, light blue or white t-shirt, and shorts. At trial, Laraway testified that although she had described the suspect as "black" during the 911 call, she really "meant dark skin," and that his skin color together with his curly hair gave Laraway the overall "image of [a] black man."

Laraway returned to her apartment to participate in a field show-up approximately two and a half hours later. As noted above, the period of time between the alleged crime and Laraway's identification of Kaneaiakala could be considered not particularly significant.

During the field show-up, Laraway again was able to see approximately half of Kaneaiakala's face. Within five to ten seconds, Laraway identified Kaneaiakala as the suspect she had seen that morning based upon his face, skin, hair, and body, and told the police that she was "almost positive that that guy was him." Although Laraway was not wearing her glasses when she initially saw the suspect male enter the subject apartment unit, she testified that she is still able to see without her glasses, even while driving, and that she could still see the suspect even though she did not have her glasses on when she first saw him. Laraway further testified that she would have told the police they detained the wrong person if she thought the person that was detained was the wrong person. Honolulu Police Department Officer Hose testified that he did not get any doubts from Laraway as to her identification of Kaneaiakala.[4] Accordingly, we conclude that there was sufficient evidence to support

---

[4] The State also presented evidence that when Kaneaiakala was arrested, he was wearing a watch that had been taken from the burglarized apartment and that other items taken from the apartment were found nearby.

Kaneaiakala's conviction.

(3)    In his final point of error, Kaneaiakala argues that his conviction should be reversed and the case remanded for a new trial because the prosecutor committed misconduct when she expressed her own personal opinion during closing arguments by stating: "[a]nd you can look at his profile in court.   I sat here through this trial.   I can see his profile clearly."

We first note that no objection was made to the challenged statement at trial, therefore, we review the alleged error for plain error.   See State v. Wakisaka, 102 Hawai'i 504, 513, 78 P.3d 317, 326 (2003) ("If defense counsel does not object at trial to prosecutorial misconduct, this court may nevertheless recognize such misconduct if plainly erroneous."); Hawai'i Rules of Penal Procedure Rule 52(b) ("Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court.").   "[Appellate courts] will not overturn a defendant's conviction on the basis of plainly erroneous prosecutorial misconduct, however, unless 'there is a reasonable possibility that the misconduct complained of might have contributed to the conviction.'"   Wakisaka, 102 Hawai'i at 513, 78 P.3d at 326 (quoting Rogan, 91 Hawai'i at 412, 984 P.2d at 1238).

> Hawaii Code of Professional Responsibility DR 7-106(C)(4) provides in part:
>
> > In appearing in his professional capacity before a tribunal, a lawyer shall not . . . [a]ssert his personal opinion as to the justness of a cause, as to the credibility of a witness, . . . or as to the guilt or innocence of an accused; but he may argue, on his analysis of the evidence, for any position or conclusion with respect to the matters stated herein.
>
> Prosecutors are similarly bound to refrain from expressing their personal views as to a defendant's guilt or credibility of witnesses. *United States v. Young*, 470 U.S. 1, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985); ABA Standards for Criminal Justice, Standard 3-5.8 (1980).
>
> The rationale for the rule is that "[e]xpressions of personal opinion by the prosecutor are a form of unsworn, unchecked testimony and tend to exploit the influence of the prosecutor's office and undermine the objective detachment that should separate a lawyer from the cause being argued." ABA Standards for Criminal Justice, Commentary, at 3.89.
> The Supreme Court has observed that a prosecuting attorney's

> "improper suggestions, insinuations, and especially, assertions of personal knowledge are apt to carry much weight against the accused when they should properly carry none." *Berger v. United States*, 295 U.S. 78, 88, 55 S.Ct. 629, 633, 79 L.Ed. 1314 (1935).

*Marsh*, 68 Haw. at 660-61, 728 P.2d at 1302.

In *Marsh*, the supreme court held that the prosecutor's presentation of her personal views during closing argument prejudiced the defendant's right to a fair trial as to amount to plain error, based in part on the fact that the prosecutor "repeatedly" stated "on at least nine occasions her belief that defense witnesses had lied." *Id.* at 660, 728 P.2d at 1302. Kaneaiakala cites to *Marsh* in arguing that the prosecutor's statements during his trial constituted reversible error. However, the prosecutor in this case, unlike the prosecutor in *Marsh*, did not repeatedly express her personal opinion regarding the credibility of a witness.

We find that *State v. Nakoa*, 72 Haw. 360, 817 P.2d 1060 (1991) is more pertinent to the facts of this case. In *Nakoa*, the defendant argued that the following statement made by the prosecutor constituted plain error:

> You have heard their testimony and *I think* that based on their demeanor in the courtroom, on your common sense, on your knowledge of human nature, and your experience that *the police officers who testified are trying their best to be as accurate as they could in their recollection of the incident that occurred.*

*Id.* at 371, 817 P.2d at 1066. In rejecting Nakoa's argument, the supreme court reasoned:

> The prosecutor's remarks in this case, when taken in context, requested that the jurors rely on their own observations, common sense, knowledge of human behavior, and experiences when judging the credibility of the two officers. The prosecutor's statement was not a direct averment of her personal belief in the officer's credibility. We therefore conclude that the prosecutor's comments were harmless beyond a reasonable doubt and that Nakoa's right to a fair trial was not substantially prejudiced.

*Id.*

In considering the context of the statement challenged by Kaneaiakala, we find the remarks surrounding the challenged statement particularly significant. Taken together, the

9

prosecutor stated:

> And you can look at his profile in court. I sat here through this trial. I can see his profile clearly. *You can decide for yourself whether you think that's distinctive where someone could look at him from the side of his face and be able to tell that he's the same person two and a half hours later.*

(Emphasis added.)   Similar to the prosecutor's remarks in <u>Nakoa</u>, the challenged statement here, taken in context, merely implored the jurors to decide for themselves the reliability of Laraway's eyewitness identification by using "their own observations, common sense, knowledge of human behavior, and experiences."   <u>Id.</u> The prosecutor's statement that she could see Kaneaiakala's profile clearly was not a direct affirmation of her personal belief in Laraway's credibility as a witness.   Accordingly, we conclude that the prosecutor's comments were harmless beyond a reasonable doubt and Kaneaiakala's right to a fair trial was not substantially prejudiced.

Based on the foregoing, the "Judgment of Conviction and Sentence" entered on September 20, 2016 in the Circuit Court of the First Circuit is affirmed.

DATED:   Honolulu, Hawai'i, November 7, 2017.

On the briefs:

Michael J. Park,
for Defendant-Appellant.

Brandon H. Ito,
Deputy Prosecuting Attorney,
for Plaintiff-Appellee.

Chief Judge

Associate Judge

Associate Judge